## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                              :
RUTH A.[1],                                   :          24-CV-00415 (RMS)
*Plaintiff,*                                  :
                                              :
V.                                            :
                                              :
LELAND DUDEK,                                 :
ACTING COMMISSIONER OF SOCIAL                 :
SECURITY,[2]                                  :
*Defendant*.                                  :
                                              :          FEBRUARY 25, 2025
------------------------------------------------------ x

## <u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This is an administrative appeal following the denial of the plaintiff's application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). It is brought pursuant to 42 U.S.C. § 405(g).

The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner"). (*See* Doc. No. 16). In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings. (*Id.*). The Commissioner, in turn, has moved for an order affirming her decision. (*See* Doc No. 18).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action, she named then-Commissioner of the Social Security Administration, Martin O'Malley, as the defendant. (*See* Doc. No. 1). On November 29, 2024, O'Malley left the agency. Leland Dudek has since been appointed as Acting Commissioner. As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for Martin O'Malley as the defendant in this matter. The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **DENIED**, and the Commissioner's motion for an order affirming that decision is **GRANTED**.

## I.    PROCEDURAL HISTORY

On February 3, 2021, the plaintiff filed an application for DIB benefits with an alleged onset date of March 15, 2020.  (*See* Doc. No. 11 (Certified Transcript of Administrative Proceedings, dated April 16, 2024 ("Tr.")) at 249-253)).  The plaintiff's application was denied initially on August 12, 2021, and again upon reconsideration on May 24, 2022.  (Tr. 149-153, 162-166).  On February 16, 2023, Administrative Law Judge ("ALJ") I. K. Harrington held a hearing at which the plaintiff and a vocational expert testified.  (Tr. 34-68).[3]  On April 13, 2023, the ALJ issued an unfavorable decision denying the plaintiff DIB benefits.  (Tr. 65-80).  On January 26, 2024, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

On March 22, 2024, the plaintiff filed the Complaint in this pending action.  (Doc. No. 1).  On March 27, 2024, the plaintiff filed a Notice indicating that she consents to a United States Magistrate Judge's jurisdiction over this matter, including the entry of a final judgment.  (Doc. No. 8).  The following day, this matter was transferred to the undersigned.  (Doc. No. 9).  On July 22, 2024, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 16), along with a supporting memorandum (Doc. No. 16-1) and a Statement of Material Facts.  (Doc. No. 16-2).  On August 21, 2024, the Commissioner filed his Motion to Affirm (Doc. No. 18), along with his own supporting memorandum.  (Doc. No. 18-1).  The plaintiff did not file a reply.

---

[3] The ALJ held the hearing via videoconference due to the circumstances presented by the COVID-19 pandemic.  (Tr. 68).

## II.     FACTUAL BACKGROUND

The medical records demonstrate that the plaintiff suffers from the following relevant physical conditions: eye stroke, low iron, depression, constipation, anemia, osteoporosis, broken left fibula, and that she has had three blood transfusions and a surgery on her small intestine.  (Tr. 300 (2E at 2)).  The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' briefing.  (*See* Doc. No. 16-2 at 1-9; Doc. No. 18-1 at 6-16).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.     The Plaintiff's Hearing Testimony

On February 16, 2023, the plaintiff appeared via videoconference for a hearing before the ALJ regarding this disability application.  (*See* Tr. 87-127).  At the hearing, the plaintiff was first questioned by her attorney.  The plaintiff testified that she was approximately five feet and four inches tall and weighed approximately one hundred and forty-five pounds, but that her weight has fluctuated since having surgery in October 2020.  (Tr. 95).  Further, the plaintiff stated that she earned a bachelor's degree in design and merchandising from Drexel University in 1982.  (Tr. 114).

The plaintiff began by testifying about her physical symptoms and medical history.  In sum, the plaintiff described her numerous bowel obstructions and ongoing symptoms of abdominal pain that required repeated hospitalizations and surgeries beginning in October 2020.

The plaintiff testified that her symptoms began suddenly on October 14, 2020, when she experienced severe stomach pain and feelings of gassiness.  (Tr. 97).  The plaintiff consequently went to the hospital where she underwent emergency surgery for a bowel obstruction.  (Tr. 97, 102).  The surgery had some complications, and the plaintiff explained that she did not feel like

she was healing well after the surgery because she could not pass gas nor go to the bathroom.  (Tr. 98).

Subsequently, the plaintiff underwent another surgery for a small bowel obstruction on November 23, 2020.  (Tr. 98).  After the November surgery, the plaintiff stated that her symptoms got progressively worse, and that she felt exhausted and experienced shortness of breath and "unbearable" fatigue.  (*Id.*).

Then, on December 20, 2020, the plaintiff went to the hospital again where she learned she had internal bleeding and post-surgical anemia.  (Tr. 98).  Consequently, the plaintiff sought treatment with hematology and oncology and received multiple blood infusions.  (Tr. 99).

From 2020 to 2022, the plaintiff continued to feel "extreme fatigue" and constipated and felt that she could not do the things she used to do, such as going up and down steps, because she was tired and experiencing shortness of breath.  (*Id.*).  She testified that she suffered from ongoing constipation and stomach distress and was taking Miralax and laxatives to manage her symptoms. (Tr. 100).  The plaintiff also testified she was taking two other heart medications, including medication for cholesterol, as well as medication for depression, after having an eye stroke and seeing a heart specialist and neurologist.  (Tr. 100-101).  When the plaintiff's attorney asked her if her medications had any side effects on her as a whole, the plaintiff testified that "the most horrible thing is the consistent constipation," and that she was careful not to take medications that would interact with each other and worsen her symptoms.  (Tr. 101).  Nevertheless, the plaintiff said that she always felt tired and "a little bit slow" and that it was harder to explain herself.  (*Id.*).

On January 28, 2022, the plaintiff went to the hospital again with complaints about another possible bowel obstruction, but she did not require surgery because she was able to have a normal bowel movement.  (Tr. 102).

4

Then, in March 2022, the plaintiff saw her primary care physician Dr. Brianna Siegel regarding a hernia. (Tr. 102). At this visit, Dr. Siegel referred the plaintiff to a surgeon because the plaintiff's hernia had grown. (*Id.*).

The plaintiff underwent surgery for the hernia in March 2022. (Tr. 102). When the plaintiff's attorney asked the plaintiff how the hernia surgery had helped her, she stated that the surgery made her stomach look better by reducing various bumps and lumps from previous surgeries. (Tr. 104).

Even after the hernia surgery, however, the plaintiff's physical symptoms continued, and she had paralytic ileus, causing her to return to the emergency department in March 2022. (Tr. 104).[4] Since then, the plaintiff testified that she suffered from chronic constipation. (Tr. 105). Consequently, the plaintiff explained that she would spend a lot of time in the restroom waiting and would take a lot of Miralax. (*Id.*). She stated that, if Miralax did not work, she would try other laxatives and suppositories and was careful not to become dehydrated. (*Id.*).

The plaintiff clarified that, according to her physicians, all of her bowel obstruction surgeries were related to scar tissue from gastric bypass surgery and not related to the hernia. (Tr. 102). The plaintiff further explained that she had surgery for an intussusception in 2006 for interim pain she was experiencing, and she did not experience that kind of abdominal pain for fourteen years until her bowel obstruction surgeries began in October 2020. (*Id.*). The plaintiff described how the pain would typically begin very abruptly, but she could not always distinguish between

---

[4] According to the transcript of the hearing testimony, the plaintiff stated she was hospitalized with an "ileus" in "March of 2020" after her hernia surgery. (Tr. 104). However, the Court understands the plaintiff to have misspoken because the plaintiff's attorney clarified immediately thereafter that the plaintiff was hospitalized from March 11, 2022 to March 16, 2022 after her hernia surgery. (Tr. 105). Additionally, the plaintiff's medical records confirm the year as 2022. (*See* Tr. 2709-2710 (16F at 413-414)).

an ordinary stomachache and the kind of stomach pain that would require her to go the hospital. (Tr. 103).

Next, the plaintiff's attorney asked the plaintiff about her daily activities. The plaintiff explained that, on a typical day, she had a hard time going to bed because she could no longer maintain the level of activity she was accustomed to before her symptoms. (Tr. 106). As a result, she would wake up for a few hours during the night and try reading or watching television to go back to sleep. (*Id.*). Each day, she would typically have coffee, feed her cats, and take care of her house. (*Id.*). The plaintiff testified that her 22-year-old son lived with her, but that she was able to do basic activities on her own, such as "getting to the grocery store or doing the laundry." (*Id.*). She explained that her days were slow because she might have to be in the bathroom for one hour or more. (*Id.*). She stated that food or drink had some effect on her need to the use the restroom, but that there was ultimately no "magic thing" to keep her bowel movements consistent, which she described as "scary." (*Id.*). Further, the plaintiff explained that she generally tried to avoid napping because it would affect her ability to sleep at night. (Tr. 106-107). However, she would sometimes take naps for one or two hours because she often felt very tired if she did too much activity in one day. (Tr. 107).

The plaintiff's attorney then questioned the plaintiff about a nerve test the plaintiff underwent in September 2021 for right wrist and elbow neuropathy. (*Id.*). The plaintiff stated that, in the summer of 2021, her symptoms had started to improve, so she tried activities such as meeting friends or taking walks on the beach. (*Id.*). However, she started experiencing numbness "everywhere," particularly in her hands, and would wake up with her fingers feeling numb. (*Id.*). As a result, the plaintiff saw an orthopedist, and she received cortisone shots to treat her symptoms. (Tr. 107-108). The plaintiff believed the cortisone shots helped treat her symptoms to some extent,

but she still could no longer do certain things she used to be able to do.  (Tr. 108).  Specifically, she could no longer needlepoint and could only spend about half an hour at a time using a computer.  (*Id.*).  The plaintiff stated that, for a long time, she unable to "lift and carry comfortably and repetitively," but that she could sometimes do her own grocery shopping if her son carried the groceries into her house.  (Tr. 108-109).  The ALJ confirmed that the plaintiff could lift a gallon of milk and generally "ten to fifteen pounds," although she would feel short of breath or tired.  (Tr. 109).  Further, the plaintiff explained that generally reaching in any direction would provoke her abdominal pain, but that she could pick up things around her house such as detergent.  (Tr. 110). Her son had to help her move large items around the house.  (*Id.*).  The plaintiff stated that she could stand for a few hours at a time, walk for forty-five minutes at a time, and sit in a chair for a few hours at a time.  (*Id.*)  The plaintiff added that, because she generally loved to be active and to work, adjusting to her symptoms had been challenging.  (*Id.*).

The ALJ then further questioned the plaintiff. The plaintiff stated that she lived with her son and that her hobbies included needlepointing, reading, and streaming. (Tr. 111).  She testified that she would typically see Dr. Siegel every six months unless the plaintiff needed to see her sooner, and that the plaintiff had planned to have an additional surgery for her hands.  (*Id.*).  The plaintiff explained that she would try to avoid the additional surgery if she could because she had already undergone many surgeries, did not enjoy going to the hospital, and could manage her symptoms with cortisone shots.  (Tr. 111-112).

At the conclusion of the hearing, the ALJ kept the record open until March 6, 2024, for the updated treatment notes from the Hospital of Special Surgery and from Dr. Siegel.  (Tr. 125).

### B.    The Vocational Expert's Testimony

Vocational expert Esperanza Distefano also testified at the hearing. (Tr. 112-126). The ALJ first asked Distefano to classify the plaintiff's work history. Distefano testified that the plaintiff was an in-store store manager from December 2018 to July 2019, and from February 2021 to March 2021, for a total of nine months. (Tr. 115). Distefano classified this work as a store manager, a skilled position that the plaintiff performed at the medium exertional level, which departed from the DOT's classification as light exertion. (*Id.*). Distefano opined that the plaintiff "did not perform the job long enough to perform the job with efficiency." (*Id.*).

Next, Distefano described the plaintiff's work as a sales supervisor for Brooks Brothers between February 2018 to December 2018. (Tr. 115). Distefano classified this position as a sales supervisor, a skilled position that the plaintiff performed at the medium exertional level. (*Id.*) Although the DOT guidelines classified the sales supervisor as sedentary, Distefano found the plaintiff performed this job at the medium exertional level because she lifted "between less than ten pounds to 25 or 30 pounds . . . ." (*Id.*). Distefano further opined that the plaintiff performed the job long enough to perform the job with efficiency. (Tr. 115-116).

Then, Distefano classified the plaintiff's job at Chico's from February 2018 to February 2019 as a sales associate, a semiskilled position the plaintiff performed at the medium exertional level. (Tr. 116). Again, although the DOT guidelines classified the position as light exertion, because the plaintiff lifted between less than ten pounds and up to twenty or twenty-five pounds, Distefano found the plaintiff performed the job at the medium exertional level. (*Id.*).

Next, Distefano classified the plaintiff's job between February 2015 to February 2017 as an assistant manager, a skilled position that the plaintiff performed at the medium exertional level, despite the DOT guidelines classifying the position as light exertion, because she lifted between less than ten pounds to twenty-five pounds. (Tr. 116).

Distefano classified the plaintiff's job at Great Stuff from June 2014 to February 2015 as a sales associate, a semiskilled position the plaintiff performed at the medium exertional level, again departing from the DOT guidelines classifying the position as light exertion because the plaintiff lifted between less than ten pounds to twenty-five pounds.  (Tr. 116).

Two of the plaintiff's jobs in the record had no specific information, and Distefano needed more information from the plaintiff before testifying as to their classification.  The first was the plaintiff's work as a sales agent for Allstate Insurance between October 2012 to December 2013.  (Tr. 117).  The plaintiff explained that she performed the job mostly sitting down and did not lift more than ten pounds.  (*Id.*).  Distefano subsequently classified the work as an insurance agent, a skilled position performed at the light exertional level.  (Tr. 118).  However, Distefano found that the plaintiff performed the job sedentary, departing from the DOT guidelines.  (*Id.*).

The second job that lacked information was the plaintiff's past work as a freelance consultant for apparel and home from 2006 to 2012.  (Tr. 117).  The plaintiff testified that she would help companies build their businesses related to apparel and home goods, which often required traveling or commuting to meetings and lifting less than ten pounds.  (Tr. 118-119).  The ALJ asked the plaintiff to exclude her time commuting and to focus on any standing or walking done once she arrived at the client's venue.  (Tr. 120).  The plaintiff clarified that she would make presentations or go to trade shows where she was on her feet for several hours, and the frequency varied week to week depending on the project.  (*Id.*).  Distefano consequently classified this work as a professional consultant, a skilled position performed sedentary.  (Tr. 121).  However, Distefano found the plaintiff performed the job at the light exertional level, departing from the DOT guidelines.  (*Id.*).

The ALJ then presented several hypotheticals and asked Distefano to opine on the possible substantial gainful activity with the following assumptions: the person would have the plaintiff's age, education, work experience, and capability of working at the light exertional level. (Tr. 122).

First, the ALJ asked Distefano if an individual could perform the plaintiff's past work if the individual could (1) "perform light work with frequent balance, stoop, kneel, crouch, crawl"; and (2) occasionally "climb ramps and stairs, ladders, ropes and scaffolding." (Tr. 122). Distefano opined that this individual could perform the store manager, sales supervisor, sales associate, and assistant manager positions as generally performed, and the sales agent and professional consultant positions as the plaintiff performed them. (*Id.*). Further, Distefano testified that the individual would not be able to perform the store manager, sales supervisor, sales associate, or assistant manager positions as the plaintiff performed them. (*Id.*).

Next, the ALJ asked Distefano about whether the individual with the same limitations could perform the plaintiff's past work if the individual would be absent two or more days per month, including arriving late and leaving early on a consistent basis. (Tr. 122). Distefano answered that an individual who is absent two or more days per month may be able to perform the essential functions of the job, but "would not be able to maintain employment." (*Id.*).[5] Additionally, Distefano clarified that she considered the absences from work as absences, although employers often addressed arriving late or leaving early differently, and the DOT did not discuss absenteeism. (Tr. 123). Distefano elaborated that her opinion was based on her "over twenty-five years of experience in placing individuals with physical, cognitive and/or emotional limitations on jobs and knowing what employers have as policy." (Tr. 123-124).

---

[5] Distefano confirmed in her answer that she was not taking into consideration "any approved time an individual may have such as sick leave, vacation leave or personal leave." (Tr. 123).

The plaintiff's attorney then questioned Distefano.  The plaintiff's attorney first asked Distefano whether the individual in the ALJ's first hypothetical could perform the plaintiff's past work if she were limited to occasional reaching in all directions.  (Tr. 124).  Distefano answered that she would need to review the jobs, but she confirmed the individual would be able to perform the consultant and assistant manager positions because "[t]here's only occasional reaching with that and overhead reach is not an essential function of that job."  (Tr. 124-125).  Distefano also stated those jobs would involve occasional fingering and handling.  (Tr. 125).

Next, the plaintiff's attorney asked Distefano whether an individual could perform the plaintiff's past work if the individual were limited to unskilled work due to chronic pain or any other reason.  (Tr. 125).  Distefano confirmed that such an individual could not perform the plaintiff's past work.  (*Id.*).

Then, the plaintiff's attorney asked Distefano about an employer's tolerance or off-task behavior.  (Tr. 125).  Distefano explained that, in her opinion, most employers would tolerate ten percent, but not twenty percent, of off-task behavior.  (*Id.*).  Further, Distefano opined that "if an individual is off task 15% of the time there would be at least a 50% erosion of jobs such an individual would be able to maintain. The closer the individual would get from the 15% mark to the 20% mark the more erosion there would be."  (*Id.*).  She further stated that off-task behavior was not an exact science and depended largely on the individual employer and the nature of the job description, such as whether the individual worked with others or worked alone.

C.    **Objective Medical Evidence**

The relevant issues in this appeal involve the ALJ's findings regarding the plaintiff's postural and exertional limitations.  In formulating the plaintiff's RFC, the ALJ cites to objective medical evidence from the plaintiff's primary care physician Dr. Brianna Siegel and treatment

records from Yale New Haven Hospital, Stamford Hospital, Greenwich Hospital, Yale Bariatric Surgery, and Stamford Health.

On October 14, 2020, the plaintiff went to the emergency department at Greenwich Hospital because she was experiencing sharp, severe abdominal pain, distension, nausea, and vomiting which began after eating a large meal. (Tr. 565 (2F at 99)). The plaintiff reported the pain was similar to her intussusception in 2014. (*Id.*).[6] After an abdominal and pelvic CT scan, the plaintiff was diagnosed with volvulus of the small intestine and small bowel obstruction, and she was consequently admitted to the hospital. (Tr. 567, 572 (2F at 101, 106)). She recovered well and was discharged in stable condition on October 17, 2020. (Tr. 572-594 (2F at 106-128)).

On November 11, 2020, the plaintiff went to the emergency department at Greenwich Hospital again after experiencing abdominal pain on her left side and nausea. (Tr. 557-558) (2F at 91-92)). Upon examination, the plaintiff had a midline incision with a raised area of indurated skin with fibrinous exudate from her October 2020 bowel obstruction surgery. (Tr. 560 (2F at 94)). She was discharged the same day. (Tr. 561 (2F at 95)).

On November 23, 2020, the plaintiff returned to the emergency department with similar complaints of abdominal pain, and a physical examination revealed that her abdomen was grossly distended with tympany and visible small bowel loops through her thin abdominal wall. (Tr. 454 (1F at 58)). A CT scan showed a grossly distended small intestine with stool in the colon and in the distal small bowel, suggesting a swirling mesenteric twist consistent with volvulus. (Tr. 453 (1F at 57)). Consequently, the plaintiff underwent "enterolysis and release of small-bowel

---

[6] Intussusception is a "serious condition in which part of the intestine slides into an adjacent part of the intestine. This telescoping action often blocks food or fluid from passing through" and "cuts off the blood supply to the part of the intestine that's affected" which "can lead to infection, death of bowel tissue or a tear in the bowel, called perforation." *See Intussusception*, Mayo Clinic (Jan. 5, 2023), https://www.mayoclinic.org/diseases-conditions/intussusception/symptoms-causes/syc-20351452 [https://perma.cc/NZ96-E6WD].

obstruction, repair of paraduodenal hernia, and resection of Roux-en-Y jejunojejunostomy with recreation of Roux-en-Y jejunojejunostomy." (Tr. 450 (1F at 54)).[7]  As with the first surgery, the plaintiff recovered well and was discharged in stable condition.  (Tr. 451 (1F at 55)).

On December 20, 2020, the plaintiff again returned to the emergency department at Greenwich Hospital because she began experiencing worsening shortness of breath and fatigue the day before.  (Tr. 480 (2F at 14)).  Additionally, the plaintiff reported constipation since her last surgery, with bowel movements every three to four days that required straining.  (Tr. 485 (2F at 19)).  After some workups and imaging, the plaintiff was diagnosed with severe, symptomatic microcytic anemia with questionable melena, admitted to the hospital, and discharged three days later.  (Tr. 492 (2F at 26); 517 (2F at 51)).  Her abdominal exam was benign, there was no evidence of active gastrointestinal bleeding, surgery was not recommended, and no other significant physical abnormalities were noted.  (Tr. 516-519 (2F at 50-53)).  On December 24, 2020, the day after she was discharged, the plaintiff saw her primary care physician Dr. Siegel, where the plaintiff reported feeling "much better" and denied abdominal pain, constipation, or diarrhea, and did not report symptoms of small bowel obstruction.  (Tr. 397-399 (1F 1-3)).  Dr. Siegel likewise found no significant abdominal or other physical abnormalities, and noted the plaintiff had normal bowel sounds with no guarding or rigidity, no hernias, and no tenderness.  (*Id.*).

On January 4, 2021, the plaintiff saw Dr. Francesca Montanari for a hematology evaluation.  (Tr. 472-475 (2F at 6-9)).  The plaintiff reported experiencing fatigue and constipation, but no abdominal pain, bleeding, diarrhea, nausea, or vomiting.  (Tr. 473 (2F at 7)).  Her gait was normal, and Dr. Montanari did not note any focal sensory or motor deficits.  (Tr. 475 (2F at 9)).  Dr.

---

[7] Jejunojejunostomy "is a type of gastric/intestinal bypass procedure. It connects your stomach directly to the middle part of your small intestine (jejunum), bypassing the first part (duodenum)." *Gastrojejunostomy*, Cleveland Clinic (Nov. 2, 2022), https://my.clevelandclinic.org/health/treatments/24408-gastrojejunostomy [https://perma.cc/H5LS-KF8X].

Montanari noted the plaintiff's blood work was consistent with iron deficiency anemia and planned for iron infusions as needed. (Tr. 475-476 (2F at 9-10)).

On January 7, 2021, the plaintiff underwent a bone density scan which revealed osteoporosis in her lumbar spine, femoral neck, and distal left radius. (Tr. 435-436 (1F at 40-41)). On February 26, 2021, the plaintiff saw Dr. Rebehkah Gospin for an endocrinology examination regarding her osteoporosis diagnosis, who recommended conservative treatment including calcium and vitamin intake and weight bearing and strength training exercises. (Tr. 881-882 (5F at 26-27)).

On August 6, 2021, the plaintiff saw Dr. Siegel to follow up on her blood pressure and to address peripheral neuropathy in her hands. (Tr. 3353 (19F at 11). The plaintiff denied abdominal pain, constipation, and diarrhea, but reported numbness in both hands while kayaking, and stated that she wanted to get surgical revision for abdominal scars related to her umbilical hernia. (*Id.*). Dr. Siegel subsequently referred the plaintiff for surgery related to her hand and umbilical hernia.

On December 22, 2021, the plaintiff saw Dr. Andrew Duffy for evaluation of her midline incisional hernia. (Tr. 3026 (17F 3)). The plaintiff denied pain at the time, and she was scheduled for hernia surgery on March 3, 2022. (Tr. 3028 (17F at 5)).

On January 21, 2022, the plaintiff saw Dr. Siegel regarding back and shoulder pain. (Tr. 987 (8F at 1)). The plaintiff reported that she woke up with pain in her left shoulder but felt better after a massage. (*Id.*). A physical examination revealed the plaintiff had full range of motion in her shoulders, no clubbing, and no clicking. (*Id.*). No other significant physical abnormalities were noted, and Dr. Siegel prescribed cyclobenzaprine, a muscle relaxer, to alleviate the plaintiff's symptoms. (Tr. 988 (8F at 2)).

On January 29, 2022, the plaintiff went to the emergency department at Greenwich Hospital with complaints of abdominal pain, nausea, vomiting, distention, and constipation. (Tr. 2200 (15F at 206)). Imaging revealed a small bowel obstruction, and the plaintiff was transferred to Yale New Haven Hospital for treatment. (Tr. 2209 (15F at 215)). The plaintiff received three bouts of emesis and received an enema, and she was discharged in stable condition on January 31, 2022. (Tr. 2312 (16F at 16)).

On March 3, 2022, the plaintiff underwent an open repair of her midline incisional hernia with mesh placement and bilateral myofascial flaps. (Tr. 2421 (16F at 125)). Dr. Duffy noted that the plaintiff tolerated the surgery well, and she was discharged five days after her surgery in stable condition. (*Id.*).

However, on March 11, 2022, the plaintiff went to the emergency department at Yale New Haven Hospital because she began to experience worsening nausea and abdominal pain. (Tr. 2679 (16F at 883)). Imaging revealed an anterior abdominal wall hematoma and marked distension of the excluded stomach, pancreaticobiliary limb, and proximal jejunum that was potentially related to postoperative ileus. (Tr. 2702 (16F at 406)). After receiving an enema and successfully having a bowel movement, the plaintiff was discharged in stable condition on March 16, 2022. (Tr. 2710 (16F at 414)).

At a follow-up on March 23, 2022, the plaintiff reported feeling much better, that her pain was minimal, and that she was taking Miralax and a suppository every two days to help her have a bowel movement. (Tr. 3057 (17F at 34)).

On April 26, 2022, the plaintiff followed up with Dr. Siegel and similarly reported that she was feeling "perfectly fine," having normal bowel movements, and not experiencing abdominal pain, constipation, or diarrhea. (Tr. 3363-3364 (19F at 21-22)).

On January 23, 2023, the plaintiff saw Dr. John Dowdle to evaluate her right carpal tunnel and cubital tunnel syndrome.  (Tr. 3373 (20F at 3)).  The plaintiff reported that, in the past year and a half, her hand symptoms had worsened, and she was feeling aching, numbness, and tingling throughout her right hand.  (*Id.*).  Dr. Dowdle consequently administered a carpal tunnel injection in the plaintiff's right wrist, which consisted of lidocaine and Celestone.  (Tr. 3374-3375 (20F at 4-5)).  On March 3, 2023, at a follow-up one month later, the plaintiff reported "dramatic improvement" in her symptoms, but that they had not completely resolved.  (Tr. 3371 (20F at 1)).

### D.    Medical Opinions

The medical opinions relevant to this case concern state agency consultants Dr. Abraham Colb and Dr. Rudolf Titanji, who completed the Disability Determination Examinations at the Initial and Reconsideration stages, respectively, and Dr. Brianna Siegel, the plaintiff's primary care physician.

At the initial Disability Determination Examination on August 10, 2021, state agency consultant Dr. Abraham Colb evaluated the plaintiff.  (Tr. 128-134 (2A at 1-6)).  Dr. Colb noted the plaintiff performed light work, prepared simple meals for herself, would go out a few times per week by herself, could drive, and could shop in stores and on her computer.  (Tr. 130 (2A at 2)).  Further, Dr. Colb stated that the plaintiff had difficulty with lifting, walking, stair climbing, memory, concentration, and following instructions.  (*Id.*).  After evaluating the plaintiff's medical records, Dr. Colb found the plaintiff could occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds.  (Tr. 132 (2A at 4)).  Additionally, Dr. Colb opined the plaintiff could stand or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally do all postural activities such as climbing ramps, stairs,

ladders, ropes, or scaffolds, balancing, stooping, kneeling, crouching, and crawling. (Tr. 133 (2A at 5)).

On reconsideration, state agency consultant Dr. Rudolph Titanji completed his evaluation on November 30, 2021. (Tr. 138 (3A at 4)). Similar to Dr. Colb, Dr. Titanji noted the plaintiff could drive a car, shop in stores, and complete household chores, such that the "[a]lleged extent of physical limitations such as with lifting . . . are partially consistent with the totality of evidence in the [medical evidence of record]." (*Id.*). Accordingly, Dr. Titanji agreed with Dr. Colb's assessment regarding the plaintiff's exertional and climbing limitations, but found the plaintiff could frequently, rather than occasionally, balance, stoop, kneel, crouch, and crawl.[8] (Tr. 139-140 (3A at 5-6)).

The plaintiff also submitted a medical source statement from Dr. Siegel, which was completed on November 4, 2021. (Tr. 983-984 (7F at 1-2)). In the statement, Dr. Siegel noted she had been seeing the plaintiff two to three times a year since March 2017. (Tr. 983 (7F at 1)). Dr. Siegel determined that the plaintiff could sit for four to six hours in an eight-hour workday and could stand or walk for one hour in an eight-hour workday. (*Id.*). Further, Dr. Siegel opined that the plaintiff could never lift, carry, push, or pull, could occasionally reach in all directions but never handle, finger, or feel, and that the plaintiff would be absent from work four or more days per month. (Tr. 983-984 (7F at 1-22)).

## III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA").

_____

[8] "Occasional" means up to one-third of the time and "frequent" means between one-third and two-thirds of the time. *See* SSR 83-10, 1983 WL 31251 (Jan. 1, 1983).

*See* 20 C.F.R. § 404.1520(a).[9]  In this case, the ALJ determined that the plaintiff met the insured status requirements under the SSA through June 30, 2025.  (Tr. 70).

At Step One, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 14, 2020.  (Tr. 71).

At Step Two, the ALJ determined that the plaintiff had the following severe impairments: "disorders of the skeletal spine, osteoporosis, and disorders of the gastrointestinal system (20 CFR 404.1520(c))."  (*Id.*).  The ALJ noted those impairments "significantly limit[] the [plaintiff's] ability to perform basic work activities."  (*Id.* (citing 20 CFR 404.1420(c))).  Further, the ALJ noted that the plaintiff had retinal branch occlusion and iron deficiency, both of which were generally asymptomatic with conservative treatment and thus did not affect her ability to perform work-related activities.  (*Id.*).  Similarly, the ALJ pointed out that the plaintiff suffered from right carpal tunnel and cubital tunnel syndrome but discussed how those conditions improved significantly after the plaintiff received a carpal injection, and thus only minimally affected her ability to perform work-related activities.  (*Id.*).

---

[9] An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80.  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80.

Moreover, the ALJ evaluated the areas of mental functioning set out in the Listings for evaluating mental disorders to determine whether the plaintiff's depression was severe or non-severe. *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 12.00, *et seq*. Specifically, the ALJ considered the four broad functional areas under the "paragraph B" criteria, including understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 72). The ALJ found the plaintiff's medically determinable mental impairment of depression caused no more than "mild" limitation in any of the functional areas, and that there was no more than a minimal limitation in her ability to do basic work activities. (*Id.*). Consequently, the ALJ found the plaintiff's depression to be non-severe.

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (the "Listings"). (Tr. 73). *See* 20 C.F.R. Part 404, SubPt P, App'x 1. First, the ALJ evaluated the Listings regarding musculoskeletal disorders. *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 1.00, *et seq*. The ALJ specifically considered the plaintiff's disorders of the skeletal spine and osteoporosis and determined that those impairments did not meet Listings 1.15, 1.16, 1.18, or 1.19. (*Id.*). Second, the ALJ evaluated the Listings regarding digestive disorders. *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 5.00 *et seq*. The ALJ specifically considered the plaintiff's disorders of the gastrointestinal system and determined that those impairments did not meet Listings 5.02 or 5.07. (*Id.*).

Next, the ALJ formulated the plaintiff's residual functional capacity ("RFC"). A plaintiff's RFC is the most that a claimant can do despite their impairments and is determined by assessing all the relevant evidence. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ determined

the plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) except [the plaintiff] can frequently balance, stoop, kneel, crouch, and crawl and occasionally climb ramps and stairs and ladders, ropes, or scaffolds." (Tr. 73).

At Step Four, the ALJ found that the plaintiff could perform her past work as an insurance sales agent, consultant, sales supervisor, sales associate, and assistant manager. (Tr. 78). As such, the ALJ determined that the plaintiff had not been under a disability since the alleged onset date. (Tr. 79).

## IV.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence means more than a scintilla, or in other words, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's

findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal citation omitted); *see also Wagner v. Sec'y of Health & Hum. Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (when reviewing denial of DAC, district court may not make *de novo* disability determination).   A district court "must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).   "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id.*  If there is a "reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V.   <u>DISCUSSION</u>

The plaintiff raises three main arguments in this appeal.   First, the plaintiff argues the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to account for the "total limiting effects" of the plaintiff's combined impairments, including Dr. Siegel's opinion that the plaintiff would miss at least four days of work each month due to chronic fatigue.   (Doc. No. 16-1 at 3).   Second, the plaintiff claims the ALJ improperly discounted Dr. Siegel's opinion and that Dr. Siegel's opinion was consistent with the medical evidence.   (*Id.* at 9-11).   Third, the plaintiff maintains the ALJ improperly discredited the plaintiff's testimony.   (*Id.* at 12-13).   The

Commissioner challenges all three arguments and responds that the ALJ's RFC is properly supported by the plaintiff's treatment notes, her daily living activities, and the assessments by the state agency physicians, and that the ALJ properly evaluated Dr. Siegel's opinion and the plaintiff's credibility. (Doc. No. 18-1 at 6-17).[10]

For the reasons below, the Court finds that substantial evidence supports the ALJ's decision and therefore remand is not warranted. In particular, the Court concludes that the ALJ appropriately weighed all of the evidence in formulating the RFC, including the "total limiting effects" of the plaintiff's combined impairments and Dr. Siegel's opinion that the plaintiff would miss at least four days of work each month due to chronic fatigue. Further, the ALJ properly discounted Dr. Siegel's medical opinion because it was not supported by Dr. Siegel's treatment notes and was not consistent with the record as a whole. Finally, the ALJ properly considered the plaintiff's complaints of pain.

### A.    Medical Opinion Evidence

Because an RFC depends in part on a proper evaluation of the medical opinion evidence, the Court begins by analyzing the ALJ's assessment of the medical opinions. A "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions," including, in relevant part, a plaintiff's "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." 20 C.F.R. § 404.1513(a)(2)(i).

---

[10] Although the plaintiff's brief summarizes her arguments under two primary headings, the Commissioner's opposition seems to identify and respond to five separate claims within those two arguments. The Court construes the plaintiff's motion as raising three substantive issues and addresses them in a different order than was presented in the briefing.

Section 404.1520c of Title 20 of the Code of Federal Regulations sets forth the parameters an ALJ must follow when evaluating the persuasiveness of a medical opinion or prior administrative medical finding. The Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ evaluates the medical opinions by applying the five factors listed in 20 C.F.R. §§ 404.1520c(c)(1)–(c)(5). These factors are: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factors.

Of these factors, "supportability" and "consistency" are the most important, and an ALJ must explicitly articulate how she considered them. See 20 C.F.R. § 404.1520c(b)(2). When considering "supportability," the ALJ is expected to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). The "consistency" factor relates to an opinion's consistency with other evidence in the record. "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). An ALJ may explain how she considered the other three factors, but she is generally not required to do so. See 20 C.F.R. § 404.1520c(b)(2).

The ALJ considered the medical opinion evidence from Dr. Abraham Colb, the state agency medical consultant at the initial level, Dr. Rudoph Titanji, the state agency medical consultant at the reconsideration level, and Dr. Brianna Siegel, the plaintiff's primary care physician. (Tr. 76-77). The plaintiff does not take issue with the ALJ's assessments of the opinions of Dr. Colb and Dr. Titanji. (Doc. No. 16-1 at 10). Rather, the plaintiff argues that the

ALJ unreasonably found Dr. Siegel's opinion unpersuasive; the plaintiff claims that the opinion was consistent and supported by the record, and the ALJ's reasoning was incomplete. (*Id.* at 9-11). The Commissioner argues the ALJ properly evaluated Dr. Siegel's opinion and adequately explained that she found it only minimally persuasive because Dr. Siegel's opinion was not supported by her treatment notes and was inconsistent with the record as a whole. (Doc. No. 18-1 at 14).

The ALJ evaluated one medical source statement from Dr. Siegel from November 4, 2021. (Tr. 983-986 (7F at 1-4)). Dr. Siegel opined that the plaintiff could sit for four to six hours in an eight-hour workday and stand or walk for only one hour. (Tr. 983 (7F at 1)). Further, Dr. Siegel determined that the plaintiff could never lift, carry, push or pull, could only occasionally reach in all directions, and could never handle, finger, or feel. (*Id.*). Finally, Dr. Siegel found that the plaintiff would be absent from work four or more days per month. (Tr. 984 (7F at 2)). The ALJ found that Dr. Siegel's medical source statement was not persuasive because it was not supported by Dr. Siegel's treatment notes, and it was not consistent with the record. (Tr. 77). The ALJ did not discuss the other three factors.

The Court concludes that the ALJ correctly found Dr. Siegel's opinion to be minimally persuasive. Beginning with the supportability factor, the plaintiff saw Dr. Siegel on December 24, 2020, after she went to the emergency room on December 20, 2020. (Tr. 397 (1F at 1)). As both the ALJ and the Commissioner correctly describe, the plaintiff reported having a bowel movement approximately every two days, and reported no abdominal pain, symptoms of small bowel obstruction, constipation, or diarrhea. (Tr. 398-399 (1F at 2-3)). Upon examination, Dr. Siegel found no significant abdominal or other physical abnormalities. (Tr. 397 (1F at 1) (noting "normal bowel sounds," "no guarding or rigidity," "no hernias present, no masses palpable, no rebound

tenderness, soft nontender, nondistended, midline scar present, still healing from last surgery")).

Dr. Siegel further noted the plaintiff reported "feeling much better" than before, she was not breathless, and she did not report any fatigue.  (*Id.*).

Dr. Siegel's treatment notes from the next several follow-up appointments with the plaintiff over the subsequent months reflect similar findings.  When the plaintiff returned to Dr. Siegel on August 6, 2021, she denied symptoms of abdominal pain, constipation, and diarrhea, and did not mention fatigue.  (Tr. 3354-3355 (19F at 12-13)).  Dr. Siegel observed that the plaintiff had an incisional hernia, and noted the plaintiff eventually wanted to get surgery for her abdominal scars. (Tr. 3353 (19F at 11)).  Upon examination, Dr. Siegel noted the hernia was "without obstruction and without gangrene" and did not note any other abdominal abnormalities.  (*Id.*).  Although the plaintiff reported experiencing numbness in her hands while kayaking, Dr. Siegel found no abnormalities upon examination and referred the plaintiff to a specialist for hand surgery.  (Tr. 3353-3354 (19F at 11-12)).

Similarly, at the plaintiff's next follow-up on October 26, 2021, Dr. Siegel did not observe any abdominal abnormalities, noting "normal, bowel sounds present, soft, nontender, nondistended" and no abdominal pain or diarrhea.  (Tr. 3356 (19F at 14)).

On January 21, 2022, Dr. Siegel noted the same.  (Tr. 3359-3360 (19F at 17-18)).  During this visit, although the plaintiff reported "severe pain" in her shoulder, Dr. Siegel determined upon examination that the plaintiff had full range of motion in her shoulder and no clicking.  (Tr. 3359 (19F at 17)).

On April 26, 2022, the plaintiff returned to Dr. Siegel after her March 2022 hernia-repair surgery and latest bowel obstruction, which was treated conservatively with an enema.  (Tr. 3362 (19F at 20); 2710 (16F at 414)).  At this time, the plaintiff reported "doing great" and feeling

"perfectly fine." (Tr. 3362 (19F at 20)). Again, Dr. Siegel noted the same normal abdominal observations upon examination and no pain, constipation, or diarrhea. (Tr. 3362-3364 (19F at 20-22)).

Finally, on October 31, 2022, the plaintiff reported she was "doing okay," and that, although she was taking Miralax for constipation, she was passing gas, and she knew she did not have a small bowel obstruction. (Tr. 3365 (19F at 23)). Once again, Dr. Siegel examined the plaintiff and noted her abdomen was normal, finding no abdominal abnormalities. (*Id.*).

Therefore, given the plaintiff's lack of complaints about abdominal pain after her October 2020 and November 2020 surgeries, her statements confirming her symptoms were improving, and Dr. Siegel's consistently unremarkable examination findings, Dr. Siegel's treatment notes do not support the functional limitations she suggested in her opinion. Thus, the ALJ did not err in finding Dr. Siegel's medical opinion unpersuasive because it was unsupported by the objective medical evidence.

Additionally, the functional limitations in Dr. Siegel's opinion are inconsistent with the record as a whole. As the ALJ correctly explained, the plaintiff experienced multiple small bowel obstructions, two of which required surgery in October 2020 and November 2020, respectively (Tr. 450-451 (1F at 54-55); 572-573 (2F at 106-107)). After the surgeries for the first two bowel obstructions, the plaintiff recovered well and was discharged in stable condition within a few days. (Tr. 572-594 (2F at 106-128); 451 (1F at 55)). During the other two episodes in January 2022 and March 2022, the plaintiff experienced abdominal pain, nausea, vomiting, and constipation, and consequently went to the emergency department. (Tr. 2312 (16F at 16); 2679 (16F at 383)). In both instances, she received conservative treatment, including an enema, and was discharged in stable condition after a few days. (Tr. 2316-2317 (16F at 20-21); 2710 (16F at 414)).

Moreover, examinations have consistently revealed that the plaintiff had a normal gait, intact coordination, full strength, and intact sensation.  (*See* Tr. 1303-1304 (11F at 2-3 (October 2020 neurological examination)); 475 (2F at 9 (January 2021 hematology evaluation)) 881 (5F at 26 (February 2021 endocrinology examination))).  Notably, as the Commissioner correctly highlights, Dr. Rebekkah Gospin recommended the plaintiff engage in exercise, including "weight bearing and strength training exercise."  (Tr. 882 (5F at 27)).  Finally, in reaching their opinions that the plaintiff was capable of performing light work, both Dr. Colb and Dr. Titanji considered the plaintiff's gastrointestinal issues, including the October 2020, November 2020, January 2022 and March 2022 obstructions, her iron deficiency and osteoporosis, her largely unremarkable physical examinations, and her daily living activities such as driving, shopping, and performing household chores.  (Tr. 131-132, 134 (2A at 3-4, 6); 139-140 (3A 5-7)).  Thus, taking all of the evidence of record into account, the functional limitations Dr. Siegel imposed in her opinion are inconsistent with the record as a whole.  Accordingly, the ALJ did not err in finding Dr. Siegel's medical opinion unpersuasive.

### B.    Residual Functional Capacity Determination

In her appeal, the plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to account for the "total limiting effects" of the plaintiff's combined impairments.  (Doc. No. 16-1 at 3).  Specifically, the plaintiff claims that, although the ALJ accurately described the plaintiff's daily activities, the ALJ failed to account for the fact that the plaintiff "is unable to perform these activities for prolonged periods of time and needs assistance from her son, who lives with her, as a result of her fatigue and other symptoms . . . ."  (*Id.* at 9).  Additionally, the plaintiff claims the ALJ did not adequately consider that the plaintiff's symptoms of pain and fatigue "are the types of impairments known to present

in a variable pattern," such that the ALJ erred by relying on "periods of quiescence, while failing to account for exacerbations of various impairments and symptoms . . . ." (*Id.* at 10-11). The Commissioner asserts that the ALJ's RFC is supported by substantial evidence because the plaintiff's improvements after surgery, lack of complaints of abdominal symptoms, daily living activities and mostly unremarkable examination findings do not warrant imposing greater exertional limitations. (*Id.*).

The ALJ is "entitled to weigh all of the evidence available to make an RFC finding . . . consistent with the record as a whole." *Kelly W. v. Kijakazi*, No. 3:20-CV-948 (JCH), 2021 WL 237190, at *16 (D. Conn. Sept. 17, 2021) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)). "This [C]ourt may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner." *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-1662 (AVC), 2021 WL 6805715, at *6 n.12 (D. Conn. Nov. 16, 2021). The plaintiff, not the Commissioner, carries the burden to prove a more restrictive RFC. *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order).

In formulating the plaintiff's RFC, the ALJ determined that the plaintiff suffered from the following severe impairments: "disorders of the skeletal spine, osteoporosis, and disorders of the gastrointestinal system (20 CFR 404.1520(c))." (Tr. 71). Accordingly, the ALJ determined that the plaintiff could perform light work, except she could "frequently balance, stoop, kneel, crouch, and crawl and occasionally climb ramps and stairs and ladders, ropes, or scaffolds." (Tr. 73).

The Court concludes the ALJ's RFC determination was supported by substantial evidence in the record. In reaching her RFC determination, the ALJ considered the plaintiff's testimony and objective medical history, the medical opinions from Dr. Colb, Dr. Titanji, and Dr. Siegel, and the plaintiff's daily living activities. (Tr. 74-76). Beginning with the objective medical evidence,

the ALJ recounted the plaintiff's history of small bowel obstructions, including her surgeries in October and November 2020. (Tr. 74-75). After both surgeries, the plaintiff recovered well and without complications and was discharged in stable condition. (Tr. 594-595 (2F at 128-129); 560-561 (2F at 94-95)).

The ALJ further noted the plaintiff's December 2020 visit to the emergency department because her abdominal symptoms worsened, but discussed how her abdominal examination was benign, there was no evidence of gastrointestinal bleeding, she had no other significant physical abnormalities, and surgical intervention was not recommended. (Tr. 75). The ALJ further considered the plaintiff's January 2021 osteoporosis diagnosis, her February 2021 endocrinology examination, and her August 2021 primary care examination, which revealed she had normal reflexes, no tremors, no other significant musculoskeletal, abdominal, or physical abnormalities. (Tr. 75-76). Moreover, the ALJ discussed the plaintiff's January 2022 small bowel obstruction which resulted in her hospitalization, but was ultimately resolved with conservative treatment, including an enema. (Tr. 76). Finally, the ALJ considered the plaintiff's March 2022 hernia surgery and the plaintiff's subsequent hospitalization about one week after because she was experiencing vomiting, nausea, bloating, and fatigue. (*Id.*). Again, the ALJ highlighted that the plaintiff's symptoms improved with conservative treatment, including an enema, and the plaintiff was discharged in stable condition after having a bowel movement. (*Id.*). The ALJ noted that the plaintiff reported at her primary care examination in April 2022 that she felt significantly better and continued to recover well, her pain was minimal, and her energy levels continued to improve. (*Id.*).

Next, the ALJ discussed the medical opinions. As previously discussed, the ALJ explained that the assessments of the state agency consultants, Dr. Colb and Dr. Titanji, were persuasive

because they were supported by the explanation of the evidence they considered and consistent with the record as a whole. (Tr. 77). Both state agency consultants agreed the plaintiff could perform light work. (*Id.*). The only difference was that Dr. Colb found the plaintiff could occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, and climb ladders, ropes, or scaffolds, while Dr. Titanji found the plaintiff could do so frequently. (*Id.*). By contrast, Dr. Siegel determined that the plaintiff could sit for four to six hours and stand or walk for one hour in an eight-hour workday, could never lift, carry, push or pull, could occasionally reach in all directions, could never handle, finger, or feel, and would be absent from work four or more days per month. (*Id.*). Again, the ALJ's decision to find Dr. Siegel's opinion only minimally persuasive is supported by substantial evidence because the limitations Dr. Siegel imposed were not supported by her treatment notes nor the record as a whole, which showed that the plaintiff recovered well after each bowel obstruction and her symptoms were improving over time. (*Id.*).

Finally, the ALJ also considered the plaintiff's daily living activities. The ALJ discussed how the plaintiff had difficulty lifting more than fifteen pounds, walking for more than forty-five minutes, standing or sitting for more than a few hours, and climbing stairs. (Tr. 74). Additionally, the plaintiff struggled to remember, concentrate, follow instructions, and handle changes to her routine. (*Id.*). Further, the plaintiff had difficulty attending to her personal needs on her own such as grooming, preparing meals, performing household chores or yardwork, and managing her own finances. (*Id.*).

In her motion, the plaintiff argues the ALJ relied too heavily on the plaintiff's purported improvement from her surgeries, thus painting an overly optimistic picture of the plaintiff's abilities when "the overall picture is plainly of someone whose chief difficulties always again reared their head." (Doc. No. 16-1 at 10). Moreover, the plaintiff argues that pain and fatiguability

"are the types of impairments known to present in variable pattern" such that the ALJ erred by relying on "periods of quiescence, while failing to account for exacerbations of various impairments and symptoms . . . ." (*Id.* at 10-11). But the plaintiff cites no instances of the plaintiff's exacerbated impairments and symptoms that the ALJ overlooked, and the Court cannot identify any.

Additionally, although the plaintiff argues that the ALJ improperly discounted Dr. Siegel's opinion that the plaintiff would be absent four or more days per month (Doc. No. 16-1 at 7), for the reasons previously discussed, the ALJ properly formulated the RFC by relying on two persuasive medical opinions that did not find that the plaintiff was suffering from chronic fatigue or would be chronically absent. Moreover, the objective medical evidence similarly supports the ALJ's RFC because there is no medical evidence of a medical condition that would require the plaintiff to be absent four or more days per month. Again, the ALJ considered each of the plaintiff's small bowel obstructions and her subsequent recoveries and limited the plaintiff to light work with further postural and exertional limitations. (Tr. 73). Similarly unavailing is the plaintiff's argument that the ALJ's "rationale overlooks the obvious fact that [the] [p]laintiff did undergo invasive treatments yet continued to have significant limitations as a result of her demonstrated impairments." (Doc. No. 16-1 at 11). The plaintiff does not specify what those limitations are, or how they differ from those the ALJ imposed in the RFC.

Therefore, for all the foregoing reasons, the Court finds that the ALJ's RFC determination was supported by substantial evidence.

C. **The ALJ properly evaluated the plaintiff's subjective complaints**

A claimant's subjective complaints are "an important element in the adjudication of [Social Security] claims, and must be thoroughly considered in calculating the RFC of a claimant."

*Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010).  When assessing a claimant's RFC, "the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted).  "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable."  *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotations and citation omitted).

An ALJ must follow a two-step process for evaluating a claimant's assertions of pain and other limitations.  First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [the plaintiff's] symptoms, such as pain."  20 C.F.R. § 404.1529(b); *see also Genier*, 606 F.3d at 49.  "[S]ubjective assertions of pain *alone* cannot ground a finding of disability."  *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(a)).  Second, if the claimant does suffer from such an impairment, the ALJ must assess the claimant's credibility regarding "the intensity and persistence of [the claimant's] symptoms," to assess how those symptoms limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c).  The ALJ may not reject statements "about the intensity and persistence of [the claimant's] pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the objective medical evidence does not substantiate [the claimant's] statements."  *Id.* § 404.1529(c)(2).  Rather, the ALJ must consider factors relevant to the claimant's symptoms of pain, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain and other symptoms; (3) any precipitating or aggravating factors; (4) the effect of any medication taken to alleviate the symptoms; (5) any other treatment the

claimant has received for symptom relief; (6) any other measures the plaintiff has used to relieve symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to their pain.  20 C.F.R. § 404.1529(c)(3)(i-viii); *see Poole v. Saul*, 462 F. Supp. 3d 137, 157 (D. Conn. 2020).

In this case, the plaintiff argues that the ALJ did not properly consider the plaintiff's pain in determining her RFC. She claims that "the ALJ's selective reporting of the [plaintiff's] description of her symptoms and limitations makes her brief conclusion unreviewable because this Court can only guess why the ALJ came to this conclusion." (Doc. No. 16-1 at 12).  In other words, the plaintiff argues that the Court must necessarily "guess" at the ALJ's rationale for not crediting the plaintiff's testimony, rendering meaningful judicial review "impossible." (*Id.* at 13). The Commissioner counters that the objective medical evidence, the plaintiff's lack of abdominal symptoms throughout most of the relevant period, and her activities of daily living provide substantial evidence for the ALJ's decision to only partially credit the plaintiff's testimony. (Doc. No. 18-1 at 16).

The Court agrees with the Commissioner and finds that the ALJ adequately considered the plaintiff's complaints of pain.  As discussed in detail below, the ALJ considered the plaintiff's complaints of pain throughout her decision (Tr. 71-76) and credited some of those complaints by limiting the plaintiff to light work, frequent balancing, stooping, kneeling, crouching, and crawling, and occasional climbing of ramps, stairs, ladders, ropes, or scaffolds. (Tr. 73).  Although the ALJ did not entirely credit the plaintiff's complaints of pain, the ALJ nevertheless appropriately considered these complaints in light of the factors in 20 C.F.R. § 404.1529(c)(3)(i-viii).

First, the ALJ found the plaintiff had the following severe, medically determinable impairments: "disorders of the skeletal spine, osteoporosis, and disorders of the gastrointestinal system (20 CFR 404.1520(c))."  (Tr. 71).  The ALJ then found that those medically determinable impairments could reasonably be expected to cause the plaintiff's alleged symptoms, but that the plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."  (Tr. 74).  As previously discussed in discussing the ALJ's RFC determination, the ALJ considered the objective medical evidence and each of the plaintiff's small bowel obstructions, including both surgeries for her October and November 2020 obstructions and her hospitalizations for her January and March 2022 obstructions.  (Tr. 74).  After each episode, the plaintiff recovered well.  (Tr. 594-595 (2F at 128-129); 560-561 (2F at 94-95)).  The ALJ also considered the plaintiff's January 2021 osteoporosis diagnosis and March 2022 hernia surgery, as well as primary care examinations throughout this time, and reiterated the plaintiff's lack of abdominal complaints and significant physical abnormalities as her symptoms improved.  (Tr. 75-76; *see* 879 (5F at 24); 199 (15F at 199); 3025-3027 (17F at 3-5); 3119-3121 (17F at 96-98); 3369 (19F at 27)).

The ALJ discussed four of the factors set forth in 20 C.F.R. § 404.1529(c)(3)(i-viii).  Beginning with the plaintiff's daily living activities, the ALJ considered how the plaintiff could, with difficulty, attend to personal needs such as grooming, preparing meals, performing household chores, doing yardwork, shopping, and managing her own finances.  (Tr. 74).  Further, the plaintiff did light cleaning and her laundry, and she could drive.  (*Id.*; Tr. 320-324 (4E at 2-6)).

As to the location, duration, frequency, and intensity of the plaintiff's pain and other symptoms, the ALJ discussed throughout her opinion the plaintiff's complaints of abdominal pain, fatigue, and constipation.  (Tr. 74-76).  The ALJ noted each time the plaintiff's symptoms

worsened causing her to seek treatment at the emergency department, and how her symptoms improved after treatment. (*Id.*).

As to the effects of medication taken to alleviate any symptoms, the ALJ described how the plaintiff "had bowel movements aided by Miralax and a suppository every two days beginning with her March 2022 bariatric surgery telehealth examination." (Tr. 76).

As to other treatments to alleviate symptoms, the ALJ discussed the plaintiff's repeated admissions to the emergency department, including her surgeries and conservative treatment. (Tr. 74-76).

Consequently, the ALJ concluded that, "[c]onsidering the [plaintiff's] treatment history, the objective clinical findings, her subjective complaints, and all of the medical opinions and evidence of record . . . the [plaintiff] has the capacity to perform light work with the additional limitations set forth in the [RFC]." (Tr. 78).

Notably, the limitations imposed in the RFC confirm that the ALJ adequately considered the plaintiff's complaints of pain. The plaintiff testified that she felt "extreme fatigue" and constipated and felt that she could not do the things she used to, such as going up and down steps, because she would be tired and experience shortness of breath. (Tr. 99). The plaintiff explained that she could no longer needlepoint, and that she could only spend about half an hour using a computer. (Tr. 100). Further, the plaintiff stated that generally reaching in any direction would provoke her abdominal pain, but that she could pick up things around her house such as detergent. (Tr. 110). The plaintiff's son would have to help her move large items around the house. (*Id.*). Finally, the plaintiff testified that she could stand for a few hours at a time, walk for forty-five minutes at a time, and sit in a chair for a few hours at a time. (*Id.*)

The ALJ's RFC adequately reflects these complaints. Specifically, the ALJ limited the plaintiff to light work, except the plaintiff could frequently balance, stoop, kneel, crouch, and crawl, and occasionally climb ramps, stairs, ladders, ropers, and scaffolds. (Tr. 73). Because "occasional" means up to one-third of the time and "frequent" means between one-third and two-thirds of the time, *see* SSR 83-10, 1983 WL 31251 (Jan. 1, 1983), the ALJ did partially credit the plaintiff's testimony by imposing limitations in the RFC.

Furthermore, contrary to the plaintiff's assertion, meaningful judicial review of the ALJ's decision is not "impossible" on the ground that the ALJ did not adequately explain her reasoning in only partially crediting the plaintiff's complaints. (Doc. No. 16-1 at 13). As discussed above, the ALJ did consider many of the necessary factors in evaluating the plaintiff's complaints, and she made factual findings based on the plaintiff's testimony, thus allowing the Court to meaningfully review her credibility determination.

The ALJ thus properly considered the consistency of the plaintiff's subjective complaints with the other evidence of record. Importantly, the ALJ had the opportunity to personally observe the plaintiff and her testimony to assess her credibility. *See Pietrunti*, 119 F.3d at 1042 (holding that ALJ's credibility determination should be given great deference). Accordingly, the Court finds no error in the ALJ's assessment of the plaintiff's credibility.

## VI.    CONCLUSION

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 16) is **DENIED**. The Commissioner's motion to affirm that decision (Doc. No. 18) is **GRANTED**. The Clerk shall enter judgment and close this case.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules

of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. See 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 25th day of February, at New Haven, Connecticut.

___/s Robert M. Spector_____
Robert M. Spector,
United States Magistrate Judge